UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>Jeffery Sponseller, Sponseller Eye Care One, PC d/b/a Eye Care One, and S & H Eye Care, L.L.C. d/b/a Eye Care One<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

<u>JURY TRIAL DEMANDED</u>

## <u>COMPLAINT</u>

1.     The United States of America ("United States," "Government," or "Plaintiff"), brings this action against the Defendants pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and the common law theories of payment by mistake and unjust enrichment.

2.     Plaintiff alleges that Dr. Jeffery Sponseller, Doctor of Optometry ("O.D."), ("Sponseller" or "Defendant Sponseller") through his company - Eye Care One (defined below) - knowingly submitted false claims and knowingly caused false claims to be submitted to Medicare and Medicaid ("Government Healthcare Programs"), and the United States Railroad Retirement Board ("U.S. RRB") for optometry services that were never provided.

3.     As a result, Defendants improperly obtained over four-hundred and fifty-seven thousand dollars from Government Health Care Programs and U.S. RRB.  Through this action, Plaintiff seeks redress for its damages and Defendants' unlawful conduct under the FCA and

common law causes of action.

## JURISDICTION

4.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §
3732(a) and 28 U.S.C. §§ 1331 and 1345.  This Court possesses supplemental jurisdiction to
entertain common law and equitable causes of actions pursuant to 28 U.S.C. § 1367(a).

5.     This Court has personal jurisdiction over Defendants because, under 31 U.S.C. §
3732(a), they transact business in this District, and because Defendants submitted or caused the
submission of false or fraudulent claims to the Government in and from this District.

## VENUE

6.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because
Defendants reside and/or transact business in this District, and because Defendants committed
acts within this District that violated 31 U.S.C. § 3729.

## THE PARTIES

7      The Plaintiff is the United States of America. The Plaintiff brings this action on
behalf of the United States Department of Health and Human Services ("HHS"); the Centers for
Medicare & Medicaid Services ("CMS"), which administers the Medicare and Medicaid
programs, and on behalf of the U.S. RRB.

8.     Defendant Eye Care One, P.C. d/b/a Eye Care One ("Eye Care One") is a Georgia
corporation with its principal place of business at 3152 Washington Road in Augusta, Georgia
and is engaged in the business of providing optometry services.  Included in Eye Care One's
customer base are skilled nursing facility patients that are eligible to receive reimbursement
and/or health benefits under the Medicare and Medicaid programs, as well as patients who are
eligible to receive retirement benefits from the U.S. RRB.  Eye Care One's original Medicare

provider number was terminated on February 6, 2012, and a new provider number was activated under Dr. Tracie Sponseller, Defendant Sponseller's wife, on the same date.[1]

9.     Defendant Sponseller is a Doctor of Optometry.  Defendant Sponseller is a resident of the State of Georgia and conducts his optometry practice in Georgia and South Carolina.  At all times relevant to the acts alleged in this Complaint, Defendant Sponseller was the owner of Sponseller Eye Care One, PC d/b/a Eye Care One.

## THE LAW

10.     The FCA, 31 U.S.C. §§ 3729-33, provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment or approval to the United States and for knowingly making or using false records or statements material to false or fraudulent claims paid by the United States.  31 U.S.C. §§ 3729(a)(1), (2); 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B) (as amended).[2]

11.     The pre-FERA FCA provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the government sustains because of the act of that person[.]

---

[1]     Defendant Sponseller has reassigned his provider number to the new company which is called S&H Eye Care, LLC doing business as Eye Care One.  The practice is located at the same address as the former Eye Care One, 3152 Washington Road in Augusta, Ga.

[2]     The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009.  Although § 3729(a) was amended in its entirety, only § 3729(a)(2), which FERA renumbered as § 3729(a)(1)(B), can be applied retroactively back to and including June 7, 2008 by virtue of § 4(f) of FERA.

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729 (2007).

12.     The post-FERA FCA[3] was modified to reflect the following pertinent provisions:

(a) (1) any person who – (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[;]

(b) For purposes of this section, (1) the terms "knowing" and "knowingly" – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) requires no proof of specific intent to defraud[.]

31 U.S.C. § 3729 (2009).

13.     The standard of proof under the FCA is preponderance of the evidence.  31 U.S.C.

§ 3731(d).

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 28 C.F.R. §

85.3; 64 Fed. Reg. 47,103 (1999), the civil penalties under the False Claims Act were adjusted to

---

3       Section 4 of the Fraud Enforcement and Recovery Act of 2009 (FERA) revised certain provisions of the FCA, including section 3729(a)(2), which is now codified at the new section 3729(a)(1)(B).  In *Hoper v. Solvay Pharm.*, 588 F.3d 1318, 1327 n.3 (December 4, 2009), the United States Court of Appeals for the Eleventh Circuit concluded that the old section 3729(a)(2), rather than newly created section 3729(a)(1)(B), applies situations where the claims for payment that are at issue were filed before June 7, 2008, and the newly created section 3729(a)(1)(B) applies where the claims for payment were pending or filed on or after June 7, 2008.  Based on *Hopper*, the United States cites here in this Complaint to section 3729(a)(2) for claims filed before June 7, 2008.  The United States, however, respectfully disagrees with the *Hopper* Court's interpretation of FERA.  The United States' reading of FERA is that section 3729(a)(2) applies to FCA causes of action that were filed before June 7, 2008, and the newly created section 3729(a)(1)(B) applies to FCA causes of action that were pending or filed after June 7, 2008.

a range of $5,500 to $11,000 per claim.

## BACKGROUND

I.      **The Federal Health Care Programs**

      A.      **The Medicare Program**

15.     In 1965, Congress enacted Title XVII of the Social Security Act, known as the Medicare program, to pay for the costs of health care services and items.  *See* 42 U.S.C § 1395 – 1395ggg.

16.     Medicare is primarily administered by HHS through CMS.

17.     Eligible individuals who are age 65 or older, disabled, or receiving End Stage Renal Disease ("ESRD") services may enroll in Medicare to obtain health benefits in return for payments of monthly premiums.  42 U.S.C. §§ 1395j, 1395o, 1395r.

18.     The Medicare program consists of four parts, A, B, C, and D.  Relevant to this action is Medicare Part B, which covers medical treatment and services by physicians under 42 U.S.C. § 1395k(a)(2)(B).

19.     To assist in the administration of the Medicare Program, CMS contracts with Medicare Administrative Contractors ("MACs") to process and pay Part B claims and perform administrative functions on a regional level.  *See* 42 C.F.R. § 421.5(b).  For the relevant time period applicable to this Complaint, the Medicare Affiliated Contractor ("MAC") is Cahaba GBA, LLC.  Cahaba is the MAC responsible for processing Medicare Part B claims in the State of Georgia and other jurisdictions.

20.     CMS also contracts with companies to provide program integrity functions, such as detecting and deterring fraud, waste and abuse in the Medicare program.  The Georgia Medicare Part A and B Zone Program Integrity Contractor ("ZPIC") is AdvanceMed.

21.     At all relevant times herein, Defendants knowingly submitted and caused to be submitted false claims to Medicare through its MAC, Cahaba.

22.     Providers submit claims for Medicare Part B reimbursement from MACs pursuant to written provider agreements.  The MAC receives, processes, and pays or rejects those claims according to Medicare rules, regulations, and procedures.

23.     To participate in the Medicare program, physicians must submit a Medicare Enrollment Application, a CMS Form 855I for Individual Practitioners and a CMS Form 855B for Group Practices.  In so doing, prospective Medicare providers certify that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)[.]"

24.     After a provider's Medicare Enrollment Application is approved, a provider must generally submit a second application to the relevant Medicare contractor to become eligible to participate in Medicare's electronic claims submission program, called the Electronic Data Interchange ("EDI").

25.     As part of a provider's EDI application, the provider agrees (i) "[t]that it will submit claims that are accurate, complete, and truthful[;]" (ii) "[t]hat it will retain all original source documentation and medical records pertaining to any such particular Medicare claim for a period of at least 6 years, 3 months after the bill is paid[;]" and (iii) "[t]hat the CMS-assigned unique identifier number (submitter identifier) or [National Provider Identifier] constitutes the provider's legal electronic signature and constitutes an assurance by the provider that services were performed as billed."

26.     Defendants executed a CMS Form 855I, 855B, and EDI enrollment application, which permitted them to submit claims and accept payment for the services they provided.

27.     A physician who treats a Medicare patient is required to submit a Medicare Health Insurance Claim Form ("CMS Form 1500") to the MAC, who on behalf of CMS, pays for a portion of the claim.  In submitting Medicare claim forms, providers must certify that the information included on the form presents an accurate description of the services rendered and that the services were medically necessary.  A provider's certification that the services were medically necessary is a condition of payment of the claim.  42 C.F.R. § 424.24.

28.     By participating in the computerized billing of Medicare claims, Defendants agreed to submit claims using CMS Form 1500 and were aware of the required certifications.

### B.     The Medicaid Program

29.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. §1396– 96v, is a system of medical assistance for indigent individuals.  Though federally created, the Medicaid Program is a joint federal-state program in which the United States provides a significant share of funding.  The Medicaid Program in the state of Georgia covers, among other things, the cost of physician services.

30.     CMS administers Medicaid on the federal level.  Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels, and administrative and operation procedures.  The state pays healthcare providers directly with the state obtaining the federal share of the payment from accounts that draw on funds from the United States Treasury.  42 C.F.R. §§ 430.0-430.30.  The Secretary of HHS determines each state's federal share of most healthcare costs using a formula based on average state per capita income compared to the national U.S. average.  These matching rates are updated every year to

reflect changes in average income.  The federal assistance percentage for the state of Georgia in 2008 was approximately 63 percent.  The federal assistance percentage for the state of Georgia in 2009 was approximately 64 percent.  The federal assistance percentage for the state of Georgia in 2010 and 2011 was approximately 65 percent.

31.    The state of Georgia administers its Medicaid Program through the Georgia Department of Community Health, Division of Medical Assistance.

32.    The Georgia Medicaid Program has promulgated the Georgia Medicaid State Plan ("State Plan").   The State Plan specifically excludes from coverage "services which are inappropriate or medically unnecessary as determined by" the authorized state agencies.  State Plan, attachment 3.1-A, p. 1c, under "non-covered services and procedures," ¶ 1.

33.    To participate in the Georgia Medicaid program, a provider must submit a Provider Application Form.  In so doing, the prospective provider agrees (i) "[t]o provide to Medicaid patients, services as covered in Title XIX of the Social Security Act and the Georgia Medical Assistance Program[;]" (ii) "[t]o satisfy all requirements of the Social Security Act, as amended, and be in full compliance with the standards prescribed by Federal and State standards[;]" and (iii) "[t]o maintain all records relevant to this Agreement at his/her cost, for a period of six years or until all audits are completed, whichever is longer. Such records shall include all physical records originated or prepared pursuant to performance under this Agreement, including but not limited to, financial records, medical records, charts and other documents pertaining to costs, payments received and made, and services provided to covered Medicaid recipients[.]"

34.    Providers must agree and attest to certain statements to participate in the Georgia Medicaid program and to obtain payments under that program.

35.     Under the Georgia Medicaid program general conditions of participation, a provider agrees to "[n]either bill the Division for any services not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the Division relating to provider costs, claims, or assigned certification numbers for services rendered."

36.     Further as part of the general conditions of participation in the Georgia Medicaid Program, the providers agrees to "[b]ill the division for only those covered services that are medically necessary[4] and within the accepted professional standards of practice."

### C.     The United States Railroad Board

37.     The U.S. RRB is an independent agency in the executive branch of the United States Government that is charged with the administration of the Railroad Retirement Act (45 U.S.C. § 231 et seq.) (RRA) and the Railroad Unemployment Insurance Act.  (45 U.S.C. § 351 et seq.) (RUIA).

38.     The Railroad Retirement Act of 1974, 45 U.S.C. 231 et seq., provides a system of retirement and disability benefits for persons who pursue careers in the railroad industry.

39.     The Act is designed to "encourage older workers to retire by providing them with the means 'to enjoy the closing days of their lives with peace of mind and physical comfort,' and

---

[4]     **Medically necessary, medical necessity or medically necessary and appropriate is defined in the Medicaid regulations as** medical services or equipment based upon generally accepted medical practices in light of conditions at the time of treatment which is (a) appropriate and consistent with the diagnosis of the treating physician and the omission of which could adversely affect the eligible member's medical condition, (b) compatible with the standards of acceptable medical practice in the United States, (c) provided in a safe, appropriate and cost-effective setting given the nature of the diagnosis and the severity of the symptoms, (d) not provided solely for the convenience of the member or the convenience of the health care provider or hospital, (e) not primarily custodial care unless custodial care is a covered service or benefit under the member's evidence of coverage, and (f) there must be no other effective and more conservative or substantially less costly treatment, service and setting available. Policies and Procedures for Medicaid/Peachcare for Kids, Part I, Definitions, # 43.

so [to] 'assure more rapid advancement in the service' and also more jobs for younger workers." *Id*. at 573-574, quoting H.R. Rep. No. 1711, 74th Cong., 1st Sess. 10 (1935).

40.     Benefits under the Railroad Retirement Act are paid out of the Railroad Retirement Account established in the Treasury by 45 U.S.C. 231 and financed by employment taxes imposed on railroads and their employees.

41.     Medicare is financed by a portion of railroad retirement tier I and social security payroll taxes paid by employees and employers.

42.     CMS is the agency in charge of the Medicare Program, however, the U.S. RRB enrolls railroad beneficiaries on the Medicare program and deducts Medicare premiums from monthly benefit payments.

43.     The U.S. RRB is responsible for contracting for medical claims for processing Part B claims.

44.     Palmetto GBA processes Part B claims for railroad retirement beneficiaries in the Medicare Program.

45.     Even though U.S. RRB beneficiaries receive all of the benefits provided by the Medicare Program, the U.S. RRB only has access to Part B claims data since these claims are paid through a contract with the U.S. RRB and Palmetto GBA.

46.     The health insurance claim number of a U.S. RRB beneficiary is different from the health insurance claim number of a regular Medicare beneficiary by the location of an alpha character.  Regular Medicare beneficiaries have the alpha after the primary social security number while a U.S. RRB beneficiary has the alpha character before the primary social security number.

47.     Because the Medicare Program is billed for services provided to a U.S. RRB beneficiary, all allegations as to the Medicare Program or Medicare referenced in this Complaint encompass the U.S. RRB claims, as well.

## II.     Medical Coding

48.     Physicians and other providers typically seek payment from health care benefit programs and MACs using standard procedural codes, which correlate to the nature and degree of services provided by the provider to the beneficiary, and are used to ensure that claims are processed in an orderly and consistent manner.

49.     The American Medical Association ("AMA") and CMS assign and publish numeric codes known as Current Procedural Terminology ("CPT") codes and Healthcare Common Procedure Coding System ("HCPCS") codes, respectively.  The codes are a systematic listing of procedures and services performed by health care providers.  They include codes for optometry services.  Health care providers use CPT and HCPCS codes to describe and evaluate the services for which they claim reimbursement, and health care benefit programs use them to decide whether to issue or deny payment.

50.     Each year in the Federal Register CMS publishes a Physician's Fee Schedule in which all of the CPT codes are listed, together with the reimbursement Medicare allows for each code.

51.     CMS and AMA also disseminate authoritative coding and billing guidance, including the CPT Assistant (the official newsletter on CPT coding published by the AMA), the CMS Medicare Online Manual System, to include the Medicare Benefit Manual and the Medicare Claims Processing Manual (published by CMS), Local Coverage Decisions ("LCDs") (published by CMS contractors), and National Coverage Determinations ("NCDs") (published

by CMS). These resources are publicly available from AMA, CMS, and CMS contractors, respectively, including through their Internet websites.

A.    **Medical Coding Applicable to Physician Services Provided at Skilled Nursing Facilities**

1.    **Evaluation / Management Codes[5]**

52.    The following are American Medical Association CPT descriptions which are applicable to physician services at skilled nursing facilities:

a.    CPT Code 99304 – Initial nursing facility care, per day, for the evaluation and management of a patient, which requires 3 key components:  1) a detailed or comprehensive history; 2) a detailed or comprehensive examination; 3) medical decision making that is of straightforward or low complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.   Usually the problem(s) requiring admission are of low severity. Physicians typically spend 25 minutes with the patient and/or family or caregiver.

b.    CPT Code 99305 – Initial nursing facility care, per day, for the evaluation and management of a patient which requires these three components:   1) a comprehensive history; 2) a comprehensive examination; and 3) medical decision making of moderate complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problems(s) and the patient's and/or family's needs.   Usually, the problem(s) requiring admission are of moderate severity.   Physicians typically spend 35 minutes with the patient and/or family or caregiver.

c.    CPT code 99306 - Initial nursing facility care, per day, for the evaluation and management of a patient, which requires these three components:   1) a

---

[5]    Evaluation and Management Codes ("E/M") are codes used to specify a full system exam that includes an exam of the entire body.

comprehensive history; 2) a comprehensive examination; and 3) medical decision making of high complexity.  The CPT requires that counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually the problem(s) requiring admission are of high severity. Physicians typically spend 45 minutes with the patient and/or family or caregiver.

53.    Codes 99304, 99305 and 99306 specify that the physician has performed an exam of the entire body.  These are initial exams for new patients.  A new patient is defined as someone who has not been seen or examined within three years.

54.    There are time factors associated with these Evaluation and Management Codes. The time factor is an Evaluation/Management ("E/M") guideline to assist physicians in selecting the most appropriate E/M level.  The exam does not have to be up to the minute of the billed code.  E/M Codes 99304 through 99306 range from a low level exam of complexity and time to a high level, from 25 to 45 minutes.  Generally, the longer the exam, the more complex it is.  If a 45 minute exam is billed, there is the expectation that the exam lasted at least 36 minutes because the next lowest billable timed exam is 35 minutes.

55.    For codes 99304-99306, these evaluation and management examination codes require that the provider conduct an examination of the entire body.  These are detailed examinations.  Furthermore, the examination paperwork needs to be detailed.

56.    It is acceptable for optometrists or other subspecialties to bill under E/M codes, but it is rare because E/M codes require a complete body exam to include all body systems.  It is more common for an optometrist to bill under the general ophthalmology codes.  American Medical Association guidelines are provided and were provided as far back as 1997 for sub-specialists, such as optometrists, that focus on specific parts of the body when billing E/M codes.

57.     Although non-timed codes are billable, they would still not be paid due to Sponseller's lack of face-to-face time with the patients.  Furthermore, the minimal time he spent with beneficiaries was worthless and not considered a payable rendered service.

58.     CPT code 99306 has the highest reimbursable rate because it is considered the longest and most complex of the evaluation and management codes.

**B.     Medical Coding Applicable to General Ophthalmology Services.**

59.     The following are descriptions of CPT's codes from the American Medical Association applicable to general ophthalmology services:

a.     CPT code 92002 – Ophthalmological services: medical examination and evaluation with initiation of diagnostic and treatment program; intermediate, new patient.

b.     CPT code 92004 – Ophthalmological services: medical examination and evaluation of diagnostic and treatment program; comprehensive, new patient, one or more visits.

c.     CPT code 92012 – Ophthalmological services: medical examination and evaluation, with initiation or continuation of diagnostic and treatment program; intermediate, established patient.

d.     CPT code 92014 – Ophthalmological services: medical examination and evaluation, with initiation or continuation of diagnostic and treatment program; comprehensive, established patient, one or more visits.

e.     CPT code 92285 – External Ocular Photography[6] (with interpretation and report).

f.     CPT code 92250 – Fundus Photography[7] (with interpretation and report).

---

[6]     This CPT code requires that the provider take pictures of the eyes with an ocular camera to:  1) track the progress of a disease; or 2) check the effectiveness of a particular treatment.

[7]     This CPT code requires that the provider use a specific type of fundus camera that is able

## DEFENDANTS' FRAUDULENT SCHEME

I.      **Defendants Eye Care One and Sponseller Billed For Services Not Rendered**

      A.      **Defendants' Contracts with Skilled Nursing Facilities**

60.    At all times relevant to this Complaint, the actions refer to Defendant Sponseller and his Eye Care One location in Georgia.

61.    Defendant Sponseller has practiced optometry in Georgia since 2004.

62.    Defendant Sponseller became a licensed optometrist in Georgia on May 26, 2004.

63.    Defendant Sponseller became a participating Part B Medicare provider upon then completion and submission of a signed Medicare Federal Health Care Practitioner Enrollment Application on October 29, 2004.[8]

64.    Defendant Sponseller became a Medicaid provider on December 1, 2005.

65.    From January 1, 2008 through February 24, 2011, Defendant Sponseller participated in Government Health Care Programs as a provider and was credentialed by other major insurance carriers.

66.    From January 1, 2008 through February 24, 2011, Defendants Eye Care One and Sponseller had contracts with skilled nursing facilities throughout the state of Georgia.  These contracts were for the provision of optometry care for the patients of these various skilled nursing facilities.

---

to take photographs of the fundus of the eye.  This CPT code further requires that the patient presents with a complaint that leads you to perform this test or as an adjunct to management and treatment of a known disease.  If the images are taken as baseline documentation of a healthy eye or as preventative medicine to screen for potential disease, then it is not covered (even if disease is identified).  Further, these fundus photographs are bilateral, meaning that both eyes have been photographed.

[8]      Providers are allowed to render services before they are enrolled as long as they wait to bill for those services until they are enrolled in Medicare. Defendant Sponseller and Eye Care One were authorized to bill for services beginning on June 2, 2004.

67.     Included in the patients at these skilled nursing facilities, were Medicare, Medicaid, and U.S. RRB beneficiaries.

68.     Skilled nursing facilities are responsible for arranging for routine annual examinations, such as optical examinations, of their patients.

69.     The skilled nursing facilities entered into contracts with Defendants that allowed Defendants Eye Care One and Sponseller to provide services to the nursing home patients without any cost to the skilled nursing facilities.

70.     Defendants Eye Care One and Sponseller billed Medicare, Medicaid, U.S. RRB, and other insurance carriers for the services purportedly provided to patients at the skilled nursing facilities.

**B.      Defendants Eye Care One and Sponseller Billed for Comprehensive Eye Examination Services That Were Not Rendered**

**1.      The Fraudulent Conduct**

71.     Defendant Sponseller made routine visits to nursing facilities that he had contracts with to conduct eye examinations on patients.

72.     Defendant Sponseller allowed optometric technicians to prepare the patients for eye examinations at these skilled nursing facilities.  The duties of the optometric technicians included reviewing patient medical history and eye dilation, if required.

73.     During these visits, Defendant Sponseller briefly examined some of the patients, but not all patients, in fact, received a complete examination.  When examinations did occur, they lasted less than five (5) minutes and did not qualify for reimbursement.

74.     Defendant Sponseller billed these five (5) minute or shorter nursing home examinations under CPT code 99306.

75.     Defendant Sponseller documented these examinations as "comprehensive eye examinations" that lasted forty–five (45) minutes, when, in fact, these eye examinations lasted five (5) minutes or less.  Some eye examinations lasted two (2) minutes; some lasted one (1) minute, while others lasted only seconds.  The services rendered by Defendant Sponseller during all of these examinations were worthless.  Even 5 minutes spent with a patient where Defendant Sponseller was billing under a non-time billed code would be worthless given the lack of face time that Defendant Sponseller spent with these beneficiaries.  Further, when Defendant did bill the timed codes, there were more hours billed than present in a 24-hour period.

76.     Defendant Sponseller did not perform the services required to bill Medicare for CPT code 99306 while purportedly examining the patients at the nursing homes that he had contracts with from January 1, 2008 through February 24, 2011.

77.     Defendant Sponseller spent only five (5) minutes, at most, with these patients or did not see them at all.

78.     In order to bill Medicare or Medicaid for CPT code 99306, the following is required to be conducted by the provider:

> 1) A comprehensive history; 2) a comprehensive examination; and 3) medical decision making of high complexity.  The CPT requires that counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually the problem(s) requiring admission are of high severity.  Physicians typically spend 45 minutes with the patient and/or family or caregiver.

79.     In order to bill Medicare and Medicaid for CPT code 99306, Defendant Sponseller was required to examine the patient for a minimum of 36 minutes.  Defendant Sponseller was also required to conduct a comprehensive examination of the patient, including taking a comprehensive history and taking the time to make highly technical medical decisions.

Defendant Sponseller was also required to document the results of the comprehensive examination on the patient's chart.

80.     Defendant Sponseller did not spend 36 minutes or more examining and consulting with these patients or their family members or caregivers.

81.     Defendant Sponseller did not conduct a comprehensive examination of these patients.

82.     Defendant Sponseller did not document the results of the comprehensive examination on the patients' charts appropriately.

83.     As a result of this and similar improper conduct, Defendants Sponseller and Eye Care One wrongfully obtained payments from Plaintiff for these services that were never rendered.

84.     A former employee, whose duties included coordination of the nursing home contracts, directly observed Sponseller billing to Medicare and Medicaid for services that were not provided to the patients.

85.     Several nursing homes called this former coordinator to complain about the lack of service Defendant Sponseller provided to the patients.

86.     This former employee has indicated that Defendant Sponseller stopped bringing any optometry equipment with him to the nursing home visits.  Without this equipment, the particular services that were billed for could not be performed.

87.     During these skilled nursing facility visits, Defendant Sponseller would typically give the technicians a two-hour start to complete their preparations for the eye examination which consisted of dilating the patient's eyes, and then he would arrive at the facility later for the eye examination of the patient.

88.     A former employee observed that Defendant Sponseller would view the patients briefly with an otoscope, and then would bill Medicare for a 99306 procedural code.  This employee confirmed that Defendant Sponseller spent only a few minutes, if any at all, with each patient he examined.

89.     Defendant Sponseller falsely indicated to former employees that he could bill for the technician's preparation time, as well.

90.     Defendant Sponseller would frequently tell the technicians not to dilate the patient's eyes, in order to speed up his patient visits that were already only 5 minutes.

91.     On several occasions, Defendant Sponseller was confronted by patients' family members who complained that he had not examined the patients.  Defendant Sponseller would respond that he had examined the patients, but the patients did not remember.  However, there are documented complaints by some of these patients indicating that no exam was conducted by Defendant Sponseller.

92.     Defendant Sponseller's billing manager confirmed that Defendant Sponseller had billed Medicare, Medicaid, and/or private insurance for 11 deceased patients.  Further, Defendant Sponseller also billed Medicare and/or Medicaid for an optometry exam on a patient that only had eye sockets.

93.     On March 29, 2010, the Glendale nursing home administrator indicated that Defendant Sponseller arrived for this visit at 11:15 a.m. and exited at 2:30 p.m., during which time he examined 29 patients, including 2 new patients and 23 diabetic patients.  Defendant Sponseller claimed that he examined each of these patients for 45 minutes, during this approximate 3 hour visit, which would have equated to nearly 22 hours of examination time at Glendale Nursing Home on March 29, 2010.

C.     **Defendants Eye Care One and Sponseller Billed for Eye Photography Services That Were Not Rendered**

1.     **Requirements for External Ocular Photography-CPT code 92285**

94.     External Ocular Eye Photographs are photographs taken with an external ocular camera, which can include a close up camera, a slit lamp camera or with stereo photography. These photographs are taken of both eyes and are taken to aid in the diagnosis or treatment of a certain eye disease.

95.     In addition to requiring that photographs actually be taken with an ocular camera, Medicare and Medicaid requires that in order to bill for CPT code 92285, the following conditions must apply: 1) the photographs must provide additional information not obtained during the examination; 2) the photographs must aid in the diagnosis and treatment of a disease or condition; and 3) the photographs must be taken to assist in assessing disease progression.[9]

96.     In order to bill both Medicare and Medicaid for CPT code 92285, the medical record must contain the following:  1) the photographs or proof that the digital images exist; 2) an order for the test with medical rationale; 3) the date of the test; 4) the reliability of the test; 5) the test findings including a diagnosis, if possible; 6) the impact on treatment and prognosis; and 7) the signature of the physician.

97.     A sample review of the medical files of beneficiaries has shown that Defendants had none of the required documentation in the medical record. Further, there were no photographs located in the medical records for the patients that he was billing these photography codes on.

_____

[9]     Eye photographs that are taken merely to document disease progression are not treated as an incidental service and are not accorded separate reimbursement.

### 2.    Requirements for Fundus Photography- CPT Code 92250

98.    Fundus eye photographs are taken with a fundus camera.  A fundus camera is a specialized low power microscope that has a camera attached to it.  Fundus photography is used to compare and track changes in the retina.  Fundus photography is usually not covered for documenting the existence of a condition, but is used as a baseline and to monitor change or to confirm stability.  The frequency of subsequent fundus photographs should be determined by "medical necessity" and clearly documented in the medical record.

99.    In addition to requiring that photographs actually be taken with a fundus camera, Medicare and Medicaid requires that in order to bill for CPT code 92250, that fundus photographs be taken if the patient presents with a complaint that leads a physician to perform this test or as an adjunct to management and treatment of a known disease.  If the images are taken as baseline documentation of a healthy eye or as preventative medicine to screen for potential disease, then it is not covered.

100.    In order to bill both Medicare and Medicaid for CPT code 92250, the medical record must contain the following:  1) the photographs or proof that the digital images exist; 2) an order for the test with medical rationale; 3) the date of the test; 4) the reliability of the test; 5) the test findings including a diagnosis, if possible; 6) the impact on treatment and prognosis; and 7) the signature of the physician.

### 3.    The Fraudulent Conduct

101.    Defendant Sponseller made routine visits to nursing facilities that he had contracts with in Georgia to conduct eye examinations on the beneficiaries.

102.    Defendant Sponseller had optometric technicians that traveled with him to prep patients for eye examinations at these skilled nursing facilities.

103.    During these visits, Defendant Sponseller conducted optometry examinations on some patients but not all patients, who were Medicare, Medicaid and U.S. RRB beneficiaries.

104.    Defendant Sponseller routinely claimed that he performed eye photography procedures on these beneficiaries.  Defendants Eye Care One and Sponseller routinely billed Medicare and Medicaid for CPT code 92285 (External Ocular Photography) and CPT code 92250 (Fundus Photography).

105.    Defendant Eye Care One and Sponseller did not perform any eye photography procedures on the beneficiaries at the skilled nursing facilities.

106.    In fact, Defendant Sponseller did not even take any type of eye photography equipment (neither an ocular camera nor a fundus camera) to these skilled nursing facilities.

107.    If Defendant Sponseller did take eye photography, he took the photographs with a regular camera, not an ocular or fundus camera, which is not acceptable under Medicare, Medicaid and U.S. RRB guidelines and is a worthless service.

108.    As a result of this and similar improper conduct, Defendants Eye Care One and Sponseller wrongfully obtained payments from Plaintiffs for these services that were never rendered.

109.    Former employees of Defendant Eye Care One have confirmed that from January 1, 2008 through February 24, 2011, Defendant Sponseller would bill for services that required a photograph of the patient's eyes.  Although Defendant Sponseller claimed that he took photographs of the patient's eyes, Defendant Sponseller's staff did not observe him photograph the patients and could not locate the photographs.

110.  If Defendant Sponseller did take photographs, he took them with a regular camera, not a specialized external ocular camera or fundus camera.   A regular camera would not appropriately document the condition of the patient's eyes and treatment.

### D.   Defendants Eye Care One and Sponseller's Fraudulent Claims

111.   The claims for payment presented and caused to be presented by Defendants Eye Care one and Sponseller for optometry services were false and fraudulent because these services were not rendered, and were not payable by Medicare, Medicaid and U.S. RRB.

112.   From January 1, 2008 through February 24, 2011, Defendants Eye Care One and Sponseller presented 4,847 claims for payment to Medicare, Medicaid and the U.S. RRB for CPT codes 99306, 92285 and 92250.

113.   Defendants Eye Care One and Sponseller received more than $441,700 from Medicare, more than $14,400 from Medicare and more than $1,000 from the U.S. RRB for optometry services related to CPT codes 99306, 92285 and 92250, which were not rendered.

114.   Attached hereto, and incorporated herein, is Exhibit 1, which includes some of the false and fraudulent claims for payment presented and/or caused to be presented by Defendants Eye Care One and Sponseller to Medicare for optometry services related to CPT codes 99306, 92285, and 92250.  All the claims for payment on Exhibit 1 are false and fraudulent because none of these services were rendered or were worthless and were not payable by Medicare.

115.   Attached hereto, and incorporated herein, is Exhibit 2, which includes some of the false and fraudulent claims for payment presented and/or caused to be presented by Defendants Eye Care One and Sponseller to Medicaid for optometry services related to CPT codes 99306, 92285, and 92250.  All the claims for payment on Exhibit 2 are false and fraudulent because none of these services were rendered or were worthless and were not payable by Medicaid.

116. Attached hereto, and incorporated herein, is Exhibit 3, which includes some of the false and fraudulent claims for payment presented and/or caused to be presented by Defendants Eye Care One and Sponseller to the U.S. RRB for optometry services related to CPT codes 99306, 92285, and 92250. All the claims for payment on Exhibit 3 are false and fraudulent because none of these services were rendered or were worthless and were not payable by U.S. RRB.

**II.     Examples of Defendants' False Claims.**

117. As noted above, Defendants Eye Care One and Sponseller submitted a plethora of false claims to Government Health Care Programs under the schemes described above. These false claims were for billing for services not rendered or were worthless services. The following are representative examples.

**A.     First Example – Magnolia Manor on July 27, 2009.**

118. On July 27, 2009, Defendants Eye Care One and Sponseller submitted claims for CPT code 99306 performed at Magnolia Manor, a skilled nursing facility located in Americus, Georgia.

119. Defendants Eye Care One and Sponseller billed Medicare for 149.25 hours of 45 minute examinations.

120. Defendant Eye Care One and Sponseller's billings, however, were improper and false.

121. There were only 24 hours (1,440 minutes) in a day on July 27, 2009. Assuming Defendant Sponseller spent the minimum required time of 36 minutes with each beneficiary at Magnolia Manor, he billed for 5,373 minutes of examination and/or consultation time in total on

July 27, 2009.  As a result, Defendant Sponseller was paid for 128.25 hours on July 27, 2009, a 24-hour day.

122.     As a result of these improper billings for this skilled nursing facility, Defendants Eye Care One and Sponseller received at least $18,957.14 from Medicare to which they were not entitled.

### B.     Second Example – Parkwood Living Center on October 26, 2009

123.     On October 26, 2009, Defendants Eye Care One and Sponseller submitted claims for CPT code 99306 performed at Parkwood Living Center, a skilled nursing facility located in Snelville, Georgia.

124.     Defendants Eye Care One and Sponseller billed Medicare for 100.50 hours of 45 minute examinations.

125.     Defendant Eye Care One and Sponseller's billings, however, were improper and false.

126.     There were only 24 hours (1,440 minutes) in a day on October 26, 2009. Assuming Defendant Sponseller spent the minimum required time of 36 minutes with each beneficiary at Parkwood Living Center, he billed for 3,618 minutes of examination and/or consultation time in total on October 26, 2009.  The total hours paid to Defendants for  October 26, 2009, a 24-hour day, were 84 hours.

127.     As a result of these improper billings for this skilled nursing facility, Defendants Eye Care One and Sponseller received at least $12,865.52 from Medicare to which he was not entitled.

**C.     Third Example – HIS of Atlanta at Buckhead on July 13, 2009**

128.    On July 13, 2009, Defendants Eye Care One and Sponseller submitted claims for CPT code 99306 performed at HIS of Atlanta at Buckhead, a skilled nursing facility located in Atlanta, Georgia.

129.    Defendants Eye Care One and Sponseller billed Medicare for 77.25 hours of 45 minute examinations.

130.    Defendant Eye Care One and Sponseller's billings, however, were improper and false.

131.    There were only 24 hours (1,440 minutes) in a day on July 13, 2009.  Even assuming that Defendant Sponseller spent the minimum required time of 36 minutes with each beneficiary at HIS of Atlanta at Buckhead, he billed for 2,781 minutes of examination and/or consultation time in total on July 13, 2009.  The total hours paid for July 13, 2009, a 24-hour day, were 70.50 hours.

132.    As a result of these improper billings for this skilled nursing facility, Defendants Eye Care One and Sponseller received at least $10,861.70 from Medicare to which he was not entitled.

**D.     Fourth Example**

133.    Near the end of 2009, former employees began to notice problems with the length of time Defendant Sponseller spent with the patients and the quality of care he provided to the patients.  In particular, at Magnolia Manor Nursing Home in Columbus, Georgia, the facility was divided into three buildings, with the majority of the patients being treated for Alzheimer's and/or dementia.  The facility had approximately 200 plus residents.  Defendant Eye Care One

and Sponseller's optometry technicians were at the facility for three to four days doing patient pretests.  Defendant Sponseller told the technicians to mark the patients who would not be able to communicate with him with a star.  Defendant Sponseller billed Medicare and Medicaid for these patients without examining the patients.

134.    Former employees of Defendant Eye Care One and Defendant Sponseller confirmed that Defendant Sponseller never examined all of the patients he billed for and billed Medicare or private insurance the highest billable rate for each patient visit even when the highest rate was not applicable.

### III.    Defendants Eye Care One and Sponseller Knowingly Submitted False Claims As Sponseller Had Previous Instruction on Billing from Medicare

135.    At all times, Defendants knowingly submitted and caused to be submitted the false claims outlined above.  Defendants billed for optometry services that were not rendered in spite of express guidance from Medicare.

136.    Defendant Sponseller was previously placed on post-payment review on August 13, 2007 by Cahaba, GBA, the former PSC, for CPT codes 92002-92004 (eye exams for new patients), as his services in billing these CPT codes came under question.

137.    Defendant Sponseller was educated on level of service and medical necessity to support non-routine eye care services.

138.    In the findings of the pre-payment review, it was discovered that only 3 of 400 new patients were seen more than once.  Defendant Sponseller was averaging $2,003.16 per skilled nursing facility visit and was paid $34,053.71 in 17 days, only billing for eye exams.

139.    Further, in 2009 and 2010, several of Defendant's employees voiced concern to both Defendant Sponseller and the billing managers that he was incorrectly billing the 99306 CPT code and the 92250 and 92285 eye photography codes.

**IV.     Defendant Sponseller's Guilty Plea to False Claims**

140.    On February 20, 2013, Defendant Sponseller pleaded guilty to a single count Information in the United States District Court for the Southern District of Georgia.   United States of America v. Jeffrey Sponseller, Criminal Information No. CR 113-034.

141.    The Information alleges that on or about September 3 2009, Defendant Sponseller did make and present, and cause to be made and presented, to the Centers for Medicare and Medicaid Services, a claim, numbered 511109246660940, for reimbursement of $205 for CPT codes 99306 (examination) and 92285 (photography) purportedly performed on July 27, 2009 of a Medicare beneficiary whose initials are S.B., knowing such claim to be false, fictitious, and fraudulent.

## CAUSES OF ACTION

**I.      COUNT I – VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(pre-FERA), 31 U.S.C. § 3729(a)(1)(A) (as amended)**

142.    The United States re-alleges and incorporates herein by reference the allegations set for in Paragraphs 1 to141 above as if fully set forth herein.

143.    Defendant Sponseller both individually and through Eye Care One knowingly presented and caused to be presented false or fraudulent claims to Government Healthcare Programs and US RRB for payment or approval by billing for services that were not rendered.

144.    As a result of Defendants' false claims, the United States was damaged in an amount of to be determined at trial.   The United States is therefore entitled to treble damages

under the False Claims Act, plus a civil penalty of $5,500 to $11,000 for each false claim, as adjusted by Federal Civil Penalties Inflation Adjustment Act of 1990.

145.    All of the claims presented by Defendants Sponseller and Eye Care One for payment for CPT codes 99306, 92285 and 92250 performed at the skilled nursing facilities throughout Georgia were false under the FCA.

146.    By virtue of these false or fraudulent claims for payment, the United States suffered damages in an amount to be determined at trial.

II.    COUNT II – VIOLATIONS OF THE FALSE CLAIMS ACT
       31 U.S.C. § 3729 (a)(2)(Pre-FERA), 31 U.S.C. § 3729(a)(1)((B) (as amended)

147.    The United States re-alleges and incorporates herein by reference paragraphs 1-146.

148.    Defendants Eye Care One and Sponseller knowingly made and caused to be made false statements in order to get a false claim paid by the United States for payment, in violation of the FCA, 31 U.S.C. § 3729 (a)(2)(Pre-FERA), 31 U.S.C. § 3729(a)(1)((B) (as amended). Specifically, Defendants Eye Care One and Sponseller made and caused to be made false statements in connection with false claims for payment presented to Medicare and Medicaid for eye examinations and eye photography.  Defendants Eye Care One and Sponseller performed 5 minute or less eye examinations on patients in various skilled nursing facilities throughout Georgia and billed Medicare and Medicaid as if comprehensive 45 minute examinations were conducted on these patients, including conducting comprehensive examinations.

149.    Defendants Eye Care One and Sponseller knowingly made and caused to be made false statements in order to get a false claim paid by the United States for payment, in violation of the FCA, 31 U.S.C. § 3729 (a)(2)(Pre-FERA), 31 U.S.C. § 3729(a)(1)((B) (as amended). Specifically, Defendants Eye Care One and Sponseller billed Medicare and Medicaid for taking

both ocular photographs and fundus photographs of the patients in skilled nursing facilities throughout Georgia, yet no photography equipment was present at any of these examinations or visits.

150.   The false statements knowingly made and caused to be made by Defendants Eye Care One and Sponseller described above in paragraphs 148 and 149 were material to false claims paid by the United States and were made for the purpose of getting false claims paid by the United States.

151.   All of the claims presented by Defendants Eye Care One and Sponseller to Medicare, Medicaid and the U.S. RRB were false claims under the FCA.

152.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## III.   COUNT III – COMMON LAW – UNJUST ENRICHMENT

153.   The United States re-alleges and incorporates herein by reference paragraphs 1 - 152.

154.   From January 1, 2008 to February 24, 2011, the United States, including Medicare, Medicaid, and U.S. RRB, paid for ophthalmological services performed by Defendants Eye Care One and Sponseller that were never rendered.

155.   The United States is entitled to the return of all payments made by the United States, including payments made by Medicare, Medicaid and U.S. RRB, to Defendants Eye Care One and Sponseller for the optometry services related to CPT codes 99306, 92285, and 92250.

156.   By reason of the payments described above in paragraphs 112 through 116, Defendants Eye Care One and Sponseller have received money from Medicare, Medicaid and the

U.S. RRB to which they were not entitled.  Thus, Defendants Eye Care One and Sponseller have been unjustly enriched in an amount to be determined at trial.

## IV.    COUNT IV – COMMON LAW – PAYMENT BY MISTAKE

157.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 156.

158.    From January 1, 2008 to February 24, 2011, the United States, including Medicare, Medicaid and U.S. RRB, paid Defendants Eye Care One and Sponseller as a result of mistaken understandings of fact.

159.    The false or fraudulent claims that Defendants Eye Care One and Sponseller submitted and/or caused to be submitted to the United States, including Medicare, Medicaid and U.S. RRB, were paid by the United States based upon mistaken or erroneous understandings of material fact.

160.    The United States, acting in reasonable reliance on the truthfulness of the claims, paid to Defendants Eye Care One and Sponseller money to which they were not entitled.  Thus, Defendants Eye Care One and Sponseller are liable to account and pay such amounts, which are to be determined at trial, to the United States.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and award it the following relief:

## I.    As to the First Cause of Action

As against Defendants Eye Care One and Sponseller, judgment in the amount equal to:

    A.    FCA statutory treble damages in an amount to be established at trial;

    B.    civil penalties for each false claim presented or caused to be presented as provided by law;

    C.    the cost of this action, plus interest, as provided by law; and

    D.    any other relief that this Court deems appropriate.

**II.    As to the Second Cause Of Action**

As against Defendants Eye Care One and Sponseller, judgment in an amount equal to:

    A.    FCA statutory treble damages in an amount to be established at trial;

    B.    civil penalties for each false statement made or caused to be made as provided by law;

    C.    the cost of this action;

    D.    any other relief this Court deems appropriate.

**III.    As to the Third Cause Of Action**

As against Defendants Eye Care One and Sponseller, judgment in an amount equal to:

    A.    The money paid by the United States, including Medicare, Medicaid, and the US RRB, to, or received by, Defendants Eye Care One and Sponseller, plus interest;

    B.    the cost of this action, plus interest, as provided by law; and

    C.    any other relief that this Court deems appropriate.

**IV.    As to the Fourth Cause Of Action**

As against Defendants Eye Care One and Sponseller, judgment in an amount equal to:

    A.    The money paid by the United States, including Medicare, Medicaid and the U.S. RRB, to, or received by, Defendants Eye Care One and Sponseller, plus interest;

B.    The cost of this action, plus interest, as provided by law; and any other relief that this Court deems appropriate.

## **JURY DEMAND**

The United States requests a trial by jury.

Respectfully submitted,

EDWARD J. TARVER
UNITED STATES ATTORNEY


s/ Shannon Heath Statkus
Shannon Heath Statkus
Assistant United States Attorney
Southern District of Georgia
SC Bar No. 70410
P.O. Box 2017
Augusta, GA 30903
(706) 826-4526